ENGLISH MANOR BED AND BREAKFAST,
Plaintiff-Appellant-Cross-Respondent,

LAKEVIEW MANSION BED AND BREAKFAST, INC.,
Plaintiff,

v.

The GREAT LAKES COMPANIES, INC.,
Blue Harbor Resort Sheboygan, LLC
and Blue Harbor Resort Condominium, LLC,
Defendants-Respondents-Cross-Appellants,

CITY OF SHEBOYGAN,
Defendant-Respondent.

Court of Appeals

*No. 2005AP1358. Submitted on briefs February 2, 2006.
—Decided April 19, 2006.*

2006 WI App 91

(Also reported in 716 N.W.2d 531.)

On behalf of the plaintiff-appellant-cross-respondent, the cause was submitted on the briefs of *Barry L. Chaet, Steven W. Jelenchick,* and *Katherine L. Williams* of *Beck, Chaet & Bamberger, S.C.* of Milwaukee.

On behalf of the defendants-respondents-cross-appellants, the cause was submitted on the briefs of *Allen A. Arntsen, Henry A. Gempeler, Michael S. Heffernan* and *Tony H. McGrath* of *Foley & Lardner LLP* of Madison.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Stephen G. McLean*, city attorney of Racine.

Before Brown, Nettesheim and Anderson, JJ.

¶ 1. BROWN, J. This case involves a challenge to the City of Sheboygan's use of room tax dollars for tourism promotion and development, as permitted under WIS. STAT. § 66.0615 (2003–04).[1] Most notably, it concerns a challenge to appropriations for the Blue Harbor Resort and Conference Center on the grounds that (1) room tax dollars can only be spent on "convention" centers and Blue Harbor is a "conference" center, not a "convention" center and (2) the expenditures violate equal protection because the Blue Harbor Resort gets more benefit from the room tax dollars than other lodging establishments such as the plaintiffs. We disagree. We conclude that the supposed difference between "convention" center and "conference" center is a matter of the plaintiffs' self-generated semantics only and was certainly not a difference envisioned by the legislature when promulgating the room tax statute. Moreover, the statute does not even require that the building be a convention center so long as the facility fulfills the statutory purpose of tourism promotion and development. Also, while it is true that the Blue Harbor Resort benefits more from its conference center than other lodging facilities, there was a rational basis for it—the property upon which the resort and conference center sits was a blighted area before it was rehabilitated into a tourist attraction. Locating both a resort and conference center at that locus furthered the goal

---

[1] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

of tourism and development. We also uphold the City's other uses of room tax dollars since all promote tourism, consistent with the statutory purpose. Finally, regarding Great Lakes' cross-appeal, we uphold the circuit court's ruling that each party should pay its own costs.

## FACTUAL BACKGROUND

¶ 2. This case comes to us on summary judgment, and the uncontested facts of record are as follows. The City created Tax Incremental District (TID) Number 6 in 1992, denominating it the "South Pier District," which was part of a larger Harbor Centre Redevelopment Area. The South Pier District contained a forty-two acre brownfield site located adjacent to Lake Michigan at the mouth of the Sheboygan River that had been vacated by the C. Reiss Coal Company, which had stored coal, salt, petroleum products, and fertilizer on the site for over one hundred years. The area was unused and underutilized lake and riverfront property, and the City determined that revitalizing the area was likely to significantly enhance the value of real property located in that district. The initial project plan included the development of a major resort hotel and convention center.

¶ 3. Five years later, the City, through its common council, adopted Harbor Centre Master Plan Phase Two, which focused on several goals in the original project plan, including the following: (1) "Establish-[ing] Harbor Centre as a multi-use activity center for the community and the region, including recreational, residential, retail, office, service, cultural, educational, and government land uses," (2) "[l]ink[ing] Harbor Centre with community-wide and regional destinations," and (3) "[e]xpand[ing] opportunities for special

events, cultural arts activities and tourism within selected areas of Harbor Centre." These "selected areas" included the South Pier District. The plan specifically identified the Reiss property as the site of a proposed "regional visitor destination and civic center that will elevate Harbor Centre to a new economic level" and contemplated major hotel development.

¶ 4. In 2001, the Redevelopment Authority for the City (Authority) formally designated the Reiss property as blighted land and acquired the property. That same year, the City adopted an amendment to TID Number 6 that took into account some new developments modifying several of the original 1992 projects. The amended plan for the South Pier District proposed a mixed-use development consistent with the Harbor Centre Master Plan. This plan called for, among other things, "family resort development" and "family attraction development," which included a proposed "community center/convention center" on the Reiss property. A major goal of the plan involved "[e]stablish[ing] Sheboygan as a regional waterfront destination attraction."

¶ 5. In early 2003, the Authority and the City began negotiating a development agreement with three companies—Great Lakes Companies, Inc., Blue Harbor Resort Sheboygan, LLC, and Blue Harbor Resort Condominium, LLC—to build a hotel and convention center on a portion of the Reiss property. As the negotiation process proceeded, the parties went through numerous drafts of a development agreement, and in March, the city council approved the project as "consistent with the Harbor Centre Master Plan." In April, plaintiffs English Manor Bed and Breakfast and Lakeview Mansion Bed and Breakfast, Inc. (collectively, English Manor) submitted a notice of claim to the City, objecting to the ninth draft of the agreement because it allowed the City

770

to finance the Blue Harbor project with room tax dollars. English Manor also objected to the City's expenditure of room tax dollars for other purposes, such as band concerts and holiday celebrations.

¶ 6. Negotiations continued on the Blue Harbor project. On July 21, the City denied English Manor's claims. Shortly thereafter, on July 30, the parties adopted the final version of the development agreement.

¶ 7. The first page of the agreement states that the contract occasionally refers to the South Pier Project, of which the Blue Harbor development plan is the first phase. It also affirmed that the parties intended the development to "provide additional tourism opportunities." The agreement had several components, including: a resort consisting of a 183–room hotel and a 33,000-square-foot indoor water park, a 64–unit condominium complex with units to be sold to individual purchasers, and a convention center project. The convention center project contemplated numerous items, including a convention site of at least 29,000 square feet with a capacity to serve no less than 1000 people, an approximately 7500 square-foot full-service, sit-down restaurant designed to serve the convention center and the public, a passageway connecting the convention center to the resort, a surface parking lot for use by owners, occupants, and guests of the resort and convention center, landscaping of public areas on the convention site, installation and hook-up of utility services for the convention site, furnishing and equipment of the convention site and restaurant and all improvements thereto.

¶ 8. The Resort and Condominium LLCs were to own the resort and condominium units, respectively. They would lease the land on which these improve-

ments were constructed from the Authority, which would retain ownership of the land. The Authority would also retain ownership of the convention center site. The convention center project itself, however, would be owned by the City and leased and operated by Blue Harbor Resort.

¶ 9. The Blue Harbor project was to be financed in part by the sale of general obligation bonds. Additionally, the City planned to employ room tax revenues to retire general obligation debt that the City incurred in constructing, furnishing, equipping, and operating the convention center aspect of the Blue Harbor project. On January 5, 2004, English Manor brought suit against the City, Great Lakes, Blue Harbor Resort, and Blue Harbor Resort Condominium.

¶ 10. Later in January, an official working for the City and the Authority issued a status report concerning the South Pier Project. This report announced that Blue Harbor would open in June. According to the report, "[t]he resort and conference center will be the critical anchor tenant that will help facilitate . . . additional tourism revenue throughout the Sheboygan area" and "will showcase Sheboygan County as an exciting tourism and business destination."

¶ 11. As planned, Blue Harbor did open its doors in 2004, although the design of the convention center had been changed from the original agreement. The conference area was significantly smaller than the original 29,000 square feet. It comprised a 10,287 square-foot Grand Ballroom and a 4600 square-foot Pre-function Area.

¶ 12. English Manor's Second Amended Complaint, filed in July, raised a host of issues relating to the City's expenditure of room tax dollars. First, it contended that appropriating these revenues to finance

the Blue Harbor project violated Wis. Stat. § 66.0615, the room tax statute. English Manor complained that the statute allows a municipality to spend only a portion of room tax revenues on general purposes; otherwise, a city may spend only on constructing a convention center or on tourism promotion and development.

¶ 13. According to English Manor, the "convention center" component of the Blue Harbor project was not a bona fide convention center but rather a conference center. English Manor's argument relied in large part on the decreased size of the convention area, positing that a convention center is much larger and can host multiple large groups simultaneously. Moreover, English Manor took the position that spending on the project did not qualify as tourism promotion or development and that the City was essentially subsidizing the construction or development of a lodging facility, which the room tax statute expressly prohibits. *See* Wis. Stat. § 66.0615(1m)(d)5. English Manor opined that the resort and convention center components of the Blue Harbor project were integrally related and could not be meaningfully separated. English Manor further objected to the funding of the convention center because that aspect of the project included "a stand alone restaurant" and "[t]he Room Tax Statute does not contain a provision for the financing of a restaurant."

¶ 14. In addition to contending that the use of room tax dollars to fund the Blue Harbor project violated Wis. Stat. § 66.0615, English Manor also argued that these expenditures violated the Equal Protection Clause of the federal constitution. It pointed out that although both English Manor and Great Lakes paid room taxes, only the latter's privately owned business benefited from expenditures of room tax revenues on their property.

¶ 15. English Manor also asserted that several expenditures not related to the Blue Harbor project violated WIS. STAT. § 66.0615 because they did not qualify as tourism promotion or development. These expenditures included band concerts, a Memorial Day Celebration, an Independence Day Celebration, police department overtime for the Independence Day Celebration and other local festivals, and the Mayor's Special International Committee. The Mayor's Special International Committee comprised several smaller items. Among these were the annual "Taste of Sheboygan" event featuring vendors of various ethnic and local foods. This appropriation also provided funds for gift items presented to foreign visitors.

¶ 16. English Manor sought both declaratory relief and an injunction directing the City to spend all room tax revenues in a manner consistent with WIS. STAT. § 66.0615. All parties moved for summary judgment and submitted various affidavits, depositions, and other materials in support of their respective motions.

¶ 17. With respect to the Blue Harbor project, the evidence the parties submitted focused primarily on whether Blue Harbor's conference space qualified as a convention center. English Manor submitted testimony by experts in the tourism and convention industry that Blue Harbor's size made it impossible to simultaneously hold the multiple large gatherings typically held at a convention center. These experts identified only four facilities in Wisconsin large enough to qualify as convention centers, namely, the Midwest Airlines Center in Milwaukee, the Monona Terrace in Madison, the KI Convention Center in Green Bay, and the La Crosse Center in La Crosse. One witness, the CEO of the company that operates the Midwest Airlines Center in Milwaukee, opined that one would expect a conference

center to hold weddings, meetings, and parties. He stated that the events scheduled at Blue Harbor were the type that one would expect to see at a conference center but typically, because of their size, would not require a larger convention center like the Midwest Airlines Center. These events included The Republican Party of Wisconsin Convention, a meeting of The Wisconsin Association of School Business Officials, and annual meetings of The Wisconsin Psychiatric Association, The Wisconsin Association of School Personnel, The Wisconsin Broadcaster's Association, The Wisconsin Society of Anesthesiology, and The Law Enforcement Administrative Professional.

¶ 18. Great Lakes and the City countered that the tourism industry's understanding of the term "convention center" differed from the layman's understanding. It pointed out that several smaller facilities throughout Wisconsin comparable in size to Blue Harbor called themselves convention centers. These establishments included the Elizabeth Inn & Convention Center in Plover, the Governor Dodge Hotel & Convention Center in Platteville, the Kalahari Resort Convention Center & Waterpark in Wisconsin Dells, the Telemark Resort & Convention Center in Cable, and the Ramada Inn Convention Center in Eau Claire. It is undisputed that events held at Blue Harbor have spanned multiple days and that out-of-state visitors have attended them.

¶ 19. With respect to the other expenditures not related to Blue Harbor, the evidence demonstrated that out-of-town visitors attended the local events, including the band concerts, the local holiday celebrations, and the annual "Taste of Sheboygan." The witnesses disagreed, however, on whether these events were what drew visitors or whether they simply happened to be in town. The plaintiffs' experts asserted that tourism

promotion and development referred only to activities that drew overnight visitors to licensed lodging facilities in the area.

¶ 20. In addition to the merits, Great Lakes also asserted a procedural ground for dismissal. According to Great Lakes, English Manor's notice of claim was premature because the City received it before the defendants actually executed the development agreement. According to Great Lakes, English Manor never followed up with an effective notice after July 30, and the applicable statute of limitations had run.

¶ 21. The circuit court heard argument on February 15, 2005, and filed its decision on April 8. It rejected Great Lakes' request to dismiss based on the defective notice of claim, finding substantial compliance with statutory mandates, and proceeded to the merits. The court upheld all of the City's room tax expenditures. The court determined that the identity of Blue Harbor as a convention center versus a conference center was not dispositive because it qualified as a tourism facility. It also deemed the City's other uses of room tax dollars proper, noting that nothing in the statutory definition of tourism required local activities to generate overnight stays at lodging establishments. Further, it held that police protection attendant to such activities reasonably promoted tourism by ensuring that visitors had a safe, healthy experience which would encourage them to return.

¶ 22. The circuit court also rejected English Manor's equal protection argument. It noted the City's purposes of revitalizing moribund property, economic development, and creation of a new tax base. The court held that the City had a rational basis to locate the convention center where it did, given that the siting plan was part of a comprehensive program to revitalize

a blighted area. Accordingly, the court granted summary judgment in favor of the defendants. It ordered each party to pay its own costs.

¶ 23. English Manor and Great Lakes appeal. English Manor challenges the circuit court's decision regarding the propriety of room tax expenditures. Great Lakes cross-appeals. The cross-appeal concerns whether the court should have dismissed the complaint on the basis of improper notice and disputes the court's ruling that each party should bear its own costs.

## THE APPEAL

■■

¶ 24. In reviewing the circuit court's summary judgment in favor of Great Lakes and the City, we apply de novo the same well-known methodology as the circuit court. *See Lambrecht v. Estate of Kaczmarczyk*, 2001 WI 25, ¶¶ 20–23, 241 Wis. 2d 804, 623 N.W.2d 751. We will uphold the circuit court's grant of summary judgment when no genuine issue of material fact exists and the moving party is entitled to summary judgment as a matter of law. *Id.*, ¶ 24. In this case, our resolution of the legal questions presented also requires us to interpret Wis. Stat. § 66.0615.

■■

¶ 25. Statutory construction is also subject to de novo review. *Hughes v. Chrysler Motors Corp.*, 197 Wis. 2d 973, 978, 542 N.W.2d 148 (1996). Our interpretation aims to give effect to the legislature's intent. *Id.* We give the words in the statute their common, ordinary, and accepted meanings, and if the statute is unambiguous, we apply it as written. *See State ex rel. Kalal v. Circuit Court for Dane County*, 2004 WI 58, ¶¶ 45–46, 50, 271 Wis. 2d 633, 681 N.W.2d 110. The context and structure

of the statute inform our interpretation of its plain meaning. *Id.*, ¶¶ 46, 48. We may also turn to a recognized dictionary to determine the common understanding of a word where the legislature has not defined it. *State v. Poleshek*, 2002 WI 74, ¶ 19, 253 Wis. 2d 527, 646 N.W.2d 330.

¶ 26. Before we address English Manor's objections to the City's expenditures of room tax dollars, we deem it helpful to set forth at length the pertinent provisions of the room tax statute:

**(1)** In this section:

. . . .

(e) "Tourism" means travel for recreational, business or educational purposes.

. . . .

**(1m)** (a) The governing body of a municipality may enact an ordinance . . . imposing a tax on the privilege of furnishing, at retail . . . rooms or lodging to transients by hotelkeepers, motel operators and other persons furnishing accommodations that are available to the public . . . . Except as provided in par. (am), a tax imposed under this paragraph by a municipality may not exceed 8% . . . .

(am) A municipality that imposes a room tax under par. (a) is not subject to the limit on the maximum amount of tax that may be imposed under that paragraph if any of the following apply:

1. The municipality is located in a county with a population of at least 380,000 and a convention center is being constructed or renovated within that county.

. . . .

3. The municipality is located in a county with a

population of less than 380,000 and that county is not adjacent to a county with a population of at least 380,000, and the municipality is constructing a convention center or making improvements to an existing convention center.

4. The municipality has any long-term debt outstanding with which it financed any part of the construction or renovation of a convention center.

. . . .

(d) . . . .

2. If a municipality collects a room tax on May 13, 1994, it may retain not more than the same percentage of the room tax that it retains on May 13, 1994. If a municipality that collects a room tax on May 1, 1994, increases its room tax after May 1, 1994, the municipality may retain not more than the same percentage of the room tax that it retains on May 1, 1994, except that if the municipality is not exempt under par. (am) from the maximum tax that may be imposed under par. (a) the municipality shall spend at least 70% of the increased amount of room tax that it begins collecting after May 1, 1994, on tourism promotion and development. Any amount of room tax collected that must be spent on tourism promotion and development shall either be spent directly by the municipality on tourism promotion and development or shall be forwarded to the commission for its municipality or zone if the municipality has created a commission.

. . . .

5. The commission may not use any of the room tax revenue to construct or develop a lodging facility.

WIS. STAT. § 66.0615.

¶ 27. In essence, this statute provides that municipalities may only use room taxes for certain purposes. The statute generally allows them to levy a tax of up to eight percent and to appropriate those revenues for purposes of tourism promotion and development. Only lodging facilities are expressly excluded as permissible uses. Construction or renovation of a "convention center" is, on the other hand, a favored use of room tax monies. If a municipality wishes to allocate room tax funds for this purpose, it may exceed the eight percent threshold.

¶ 28. The parties appear to agree that WIS. STAT. § 66.0615(1m)(d)2. allows the City to retain ten percent of the room tax dollars it collects for general purposes and requires it to spend the remaining ninety percent on "tourism promotion and development." The dispute concerns whether the City's uses of room tax dollars meet this standard.

## A. The Blue Harbor Project

### 1. Statutory Basis for Funding the Convention Center

¶ 29. We begin with English Manor's objections to the use of room tax revenues to fund the convention center aspect of the Blue Harbor project. English Manor first observes that the statute singles out only convention centers as favored uses of room tax dollars. From this proposition, English Manor concludes that "[w]hen the legislature drafted the room tax statute, it did not contemplate that room tax revenues would be used for conference centers or resort/hotels with meeting space, such as Blue Harbor." Essentially, English Manor invokes the principle of *expressio unius est*

*exclusio alterius. See* BLACK's LAW DICTIONARY 1717 (8th ed. 2004) (legal maxim meaning "[t]he expression of one thing is the exclusion of another.").

¶ 30. We disagree with English Manor's interpretation of WIS. STAT. § 66.0615. We acknowledge that the statute favors expenditures to construct or improve convention facilities. *See* § 66.0615(1m)(am). However, that paragraph, (am), addresses when a municipality may impose a room tax rate of greater than eight percent. This scenario is irrelevant here because the City has not exceeded the statutory maximum. The only restrictions the rest of the statute places on the use of room tax monies are found in § 66.0615(1m)(d). Section 66.0615(1m)(d)2. directs a municipality to spend a certain percentage on "tourism promotion and development." Paragraph (d) expressly prohibits only *one* specific use of room tax revenues, constructing or developing a lodging facility, and then only when a *commission* seeks to use room tax revenues for that purpose. Sec. 66.0615(1m)(d)5. Thus, English Manor's own maxim supports the conclusion that the City's expenditures are proper so long as the City limits them to tourism promotion or development.

█

¶ 31. Although the statute does not specifically define "tourism promotion or development," it does define "tourism" as "travel for recreational, business or educational purposes." WIS. STAT. § 66.0615(1)(e). We must read § 66.0615(1m)(d) in context with (1)(e). *See Kalal,* 271 Wis. 2d 633, ¶¶ 45–46. We conclude that the legislature intended "tourism promotion and development" to mean "the promotion and development of travel for recreational, business or educational purposes." "Promote" means "to contribute to the growth or prosperity of" and "develop" means "to expand by a

781

process of growth" or "to make active or promote the growth of." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 316, 933 (10th ed. 1997) (pertinent definitions). We agree with the circuit court that whether spending on the Blue Harbor project is consistent with the legislative objective of contributing to the growth and prosperity of tourism in Sheboygan does not depend on its identity as a convention center versus a conference center. The real question is whether Blue Harbor is a magnet for educational, recreational, or business travel.

¶ 32. The record unequivocally demonstrates that Blue Harbor does draw travelers for these purposes.[2] The parties do not dispute that the groups on Blue Harbor's conference schedule came for business, recreational, or educational purposes. English Manor, however, submits that the Republican Party of Wisconsin and the other groups mentioned above would not have held their meetings at the conference center without the nearby hotel and restaurant. It cites nothing in the record to support this proposition, which we dismiss as pure speculation. Our own review of the record does not indicate that Sheboygan lacked adequate hotel and restaurant accommodations to serve conference attendees, and it borders on the incredible to suggest that conference groups like the Republican Party of Wisconsin would have been uninterested in the available conference facility at Blue Harbor but for the water park attraction and fine dining of the adjoining restaurant.

---

[2] English Manor faults the circuit court for denominating Blue Harbor a "tourism facility." We do not read this language as an attempt to invent a legal term, as does English Manor. Rather, we read it as a shorthand means of expressing that the Blue Harbor facility is used for the purposes of tourism promotion and development.

¶ 33. English Manor contends that a reading of "tourism promotion or development" to include the construction of buildings other than a convention center reads the phrase too broadly. English Manor complains that our interpretation allows a municipality to build and support a lodging facility with room tax dollars, a use verboten by statute. It renews its contention below that the entire Blue Harbor project must be viewed as a whole. English Manor makes much of the fact that the agreement allows Blue Harbor Resort to operate the conference center and lease the property for a meager sum and further points out that Blue Harbor Resort and Conference Center is marketed as a single entity.

¶ 34. As the development agreement reveals, however, the Blue Harbor project comprises three subprojects, each of which is a separately owned enterprise. Blue Harbor Resort owns the resort project, while the City owns the convention center business. The City's expenditures only retire debt related to furnishing, operating, and equipping the latter. The lodging facilities are part of the resort. Nothing in the record indicates that Blue Harbor Resort's operation of both businesses has led to commingling of either capital or revenues. The facts that English Manor relies upon are therefore not sufficient to establish that room tax funds are being used to subsidize any aspect of the separate resort business.[3]

¶ 35. Although the foregoing demonstrates why Blue Harbor need not be a convention center in order to justify the City's appropriation of room tax dollars to support the project, we nonetheless address English

---

[3] As an aside, WIS. STAT. § 66.0615 only expressly forbids a *commission* from spending room tax dollars on lodging facilities. The City is not a commission.

Manor's argument that Blue Harbor is not a bona fide convention center. We deem it important to do so because the legislature has indicated that supporting a convention center *ipso facto* promotes tourism and development. *See* WIS. STAT. § 66.0615(1m)(d)3. ("A commission shall use the room tax revenue that it receives from a municipality to promote and develop tourism, *including the support of a convention center* . . . ." (Emphasis added.)). Moreover, the statute clearly singles out the use of room tax money to retire long-term debt related to the construction of a convention center as a favored use of room tax money. *See* § 66.0615(1m)(am)4. (allows municipalities to exceed the maximum rate if they use fees for this purpose).

¶ 36. Great Lakes provides a definition of "convention center" from the RANDOM HOUSE UNABRIDGED DICTIONARY (2d ed. 1993), namely "a large civic building or group of buildings designed for conventions, industrial shows and[] the like, having large unobstructed exhibit areas and often including conference rooms, hotel accommodations, restaurants, and other facilities." A "convention" means "an assembly of persons met for a common purpose; [especially] a meeting of the delegates of a political party for the purpose of formulating a platform and selecting candidates for office." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 253 (10th ed. 1997) (pertinent definitions). As we mentioned above, we may rely on recognized dictionaries to discern the common and ordinary usage of a term. One need only look at Blue Harbor's conference schedule to see that its facility clearly meets this definition. We deem the "convention center" versus "conference center" distinction purely semantic.[4]

---

[4] For this reason, we have used the terms interchangeably throughout this opinion.

¶ 37. We acknowledge that English Manor's witnesses use an alternative definition of "convention center," but again, we rely on the average person's understanding of a word, not the understanding among individuals in the tourism industry. *See Kalal*, 271 Wis. 2d 633, ¶ 45 (courts use common meaning unless term is technical or specially defined). We also cannot ignore that numerous other moderate-sized facilities, consistent with the dictionary definition, market themselves as convention centers to the public. Surely what these meeting facilities call themselves reinforces the public's understanding of what a convention center is.

¶ 38. We have a further problem with English Manor's definition of "convention center." Its preoccupation with the size of a conference facility appears to be out of sync with the legislature's intent. Wisconsin Stat. § 66.0615(1m)(am) clearly demonstrates that the legislature contemplated the construction of convention centers in more than just the state's largest urban communities. Section 66.0615(1m)(am)3. specifically addresses such construction by a municipality located in a county with a population of less than 380,000 and whose neighboring counties also have a population no greater than 380,000. It simply would not make sense to locate a facility comparable in size to the Midwest Airlines Center in one of these more moderate-sized metropolitan areas.[5]

---

[5] English Manor contends that Blue Harbor does not qualify as a bona fide convention center for additional reasons. English Manor cites, for example, the fact that Blue Harbor does not employ event service managers, caterers, or decorators and instead has merely a banquet staff. These factors appear to be significant only within the tourism industry. One would not expect an ordinary person to know what sort of personnel a convention center employs, and the dictionary definition of

## 2. Statutory Basis for Funding the Restaurant

¶ 39. As we noted above, the City appropriated room tax revenues to retire general obligation debt that the City incurred in constructing, furnishing, equipping, and operating the convention center aspect of the Blue Harbor project. The development agreement included a restaurant, now known as Weissgerber's Seabird Restaurant, in the convention center project. English Manor concedes that Weissgerber's "is integrated within the conference center aspect of the Blue Harbor Project." We have already stated that the conference center itself falls within the ambit of "tourism promotion and development" expenditures authorized in WIS. STAT. § 66.0615(1m)(d). Because of its integration with the conference center, we deem the City's use of room tax dollars to retire debt related to the restaurant proper.

¶ 40. English Manor protests that "[t]he room tax statute does not contain a provision for the construc-

---

"convention center" does not mention these factors. Again, we look to common understanding.

English Manor also points out that while a "*bona fide* convention center books conventions that contribute to overall room nights in the entire area served by the center," Blue Harbor "books as many attendees as possible to eliminate overflow." English Manor further informs us that "Blue Harbor has yet to host a meeting or conference large enough to provide overflow room nights to other Sheboygan lodging facilities." Our comments about common understanding apply here as well. Moreover, English Manor does not explain why guests staying at other facilities have to be "overflow" guests. Blue Harbor's concerted efforts to ensure that its supply of rooms meets the entire demand generated by a conference do not establish that conference goers never stay at other facilities, and English Manor has failed to adduce any evidence that this is in fact the case.

tion or support of a restaurant. Therefore, to the extent the City of Sheboygan is subsidizing any aspect of the restaurant with room tax revenues, these expenditures are also a violation of WIS. STAT. § 66.0615 . . . ." We understand English Manor to argue that because § 66.0615 expressly refers to the construction of only one type of facility, namely, a convention center, that it did not intend to permit municipalities to use room tax dollars to fund construction of other facilities. This argument appears to be another *expressio unius est exclusio alterius* analysis. We have already rejected such reasoning above.

### 3. Equal Protection

¶ 41. We now turn to English Manor's claim that the City's appropriations of room tax revenues for the Blue Harbor project violate the Equal Protection Clause because they "subsidize a single, private enterprise as opposed to being used to benefit all of the taxpaying units by promoting tourism." In other words, Blue Harbor Resort reaps benefits from room tax expenditures that "other similarly situated lodging facilities in the City of Sheboygan" do not. We have already determined that room tax allocations for Blue Harbor do promote tourism and that they do not subsidize the resort's hotel business. Thus, if the hotel business benefits more than other lodging facilities in the area from the presence of the City's conference center, such benefits are purely a function of the resort project's proximity thereto.[6] Thus, we, like Great Lakes, construe English Manor's true challenge to be that the

---

[6] Again, English Manor has not established that the plaintiffs' establishments have not benefited *at all* from the presence

City violated the Equal Protection Clause when it chose to locate a convention center in the immediate vicinity of a particular private hotel enterprise and to fund that convention center using room tax dollars.

¶ 42. Municipal acts enjoy a presumption of validity; a challenger must establish an ordinance's unconstitutionality beyond a reasonable doubt. *Thorp v. Town of Lebanon*, 2000 WI 60, ¶ 44, 235 Wis. 2d 610, 612 N.W.2d 59. Where, as here, the legislative act does not implicate suspect classifications or fundamental rights, we apply the "rational basis" level of scrutiny. *See id.*, ¶¶ 39–40. We will find a rational basis for a classification whenever it reasonably and practically relates to a legitimate municipal purpose. *Id.*, ¶¶ 40, 44. We give particular deference to the legislative determination when we review tax measures. *Simanco, Inc. v. DOR*, 57 Wis. 2d 47, 54–55, 203 N.W.2d 648 (1973). We will find a constitutional violation only when the measure involves gross misclassifications. *Id.* at 55.

¶ 43. The record amply demonstrates that the City's Harbor Centre Master Plan provided the impetus for the entire Blue Harbor development. Years before the City entered the development agreement with Great Lakes, this plan envisioned a South Pier District in which the Reiss property was transformed from a brownfield, underused property to a regional tourist attraction that would "elevate Harbor Centre to a new economic level." The City's objective of revitalizing blighted property and turning it into a travel destination is certainly a legitimate municipal purpose.

of incoming conference groups. The most one can infer from the record is that such benefits accrue unequally to the hotel at Blue Harbor.

¶ 44. The City chose a reasonable means of implementing this objective. The Harbor Centre Master Plan specifically contemplated a family resort attraction and a convention center. One would reasonably expect each to bring visitors to Sheboygan, thus satisfying the City's objective of promoting tourism, and would further expect that locating both a resort and a conference center in the South Pier District would make that district an even more appealing destination for travelers. The City did not have to choose between the two attractions. We see nothing irrational in the City's decision to include both projects in the Blue Harbor development. Moreover, the City was perfectly rational in choosing room tax dollars as the means of funding the convention center. The legislature expressly recognized the legitimacy of this use of room tax dollars in WIS. STAT. § 66.0615, and English Manor maintains that it does not challenge the constitutionality of that statute.

## B. Other Municipal Expenditures

■■

¶ 45. With respect to the City's other expenditures of room tax dollars, English Manor maintains that they are improper because they do not generate paid overnight stays at licensed lodging facilities, even though it is overnight travelers who pay the room tax. According to English Manor, the term "travel" contemplates overnight stays. We agree, based on our analysis above, that "tourism promotion and development" means contributing to the growth and prosperity of "travel for recreational, business or educational purposes." Nowhere, however, does WIS. STAT. § 66.0615 refer to overnight stays. Further, although the common understanding of "travel" certainly *includes* overnight trips, it certainly does not *require* them. WEBSTER'S THIRD

NEW INTERNATIONAL DICTIONARY 2432–33 (unbabr. 1993) defines "travel," in relevant part as a verb meaning "to go or proceed on or as if on a trip or tour: JOURNEY" or a noun meaning "the act of traveling, going, or journeying: PASSAGE" or "a journey esp. to a distant or unfamiliar place: TOUR, TRIP." We will not rewrite the statute.

¶ 46. English Manor denominates events like the holiday celebrations and band concerts "community events," because they do not generate paid overnight stays. However, none of English Manor's evidence indicates that these events do not encourage out-of-town visitors to take day trips to Sheboygan. Indeed, the plaintiffs' own witnesses have admitted that during the Independence Day Celebration, travelers "could be driving, sitting down for a – bringing a picnic lunch, sitting down and then leaving again." Great Lakes has also presented evidence that these events and the annual "Taste of Sheboygan" event draw visitors to the city.

¶ 47. Moreover, given that English Manor has not contested that these events lure visitors to the City, we agree with the circuit court that the police overtime attributable to these events also contributes to the promotion and development of tourism. Certainly, visitors will more likely have a travel experience that encourages them to return if the events are safe and orderly. Overtime necessitated by the presence of out-of-town crowds goes beyond the regular services a municipality provides for its residents.

¶ 48. Interestingly, certain testimony by English Manor's own witnesses supports many of the City's appropriations. One of English Manor's witnesses cites "marketing projects" and "transient tourist informational services" as permissible uses of room tax dollars. According to this witness, "informational services" include kiosks and brochure racks. "Marketing projects"

include advertising and promotion. This witness asserts that the mayor providing gift items to visitors would qualify as a promotion or marketing project if the local chamber of commerce or convention and visitors bureau (CVB) bought the gifts. She also stated that it would be acceptable for a chamber of commerce or CVB to promote holiday celebrations. It is simply absurd to suggest that advertising or featuring various community events in a brochure promotes tourism while actually putting on these events does not. Moreover, we do not see why it matters who buys the gifts that the mayor provides to travelers.

## THE CROSS-APPEAL

¶ 49. We now turn to the cross-appeal. We do not address Great Lakes' contention that English Manor did not give an effective notice of claim because Great Lakes prevailed on the merits and was not prejudiced by the court's failure to dismiss on the notice ground. Thus, our resolution of this issue would have no practical effect. *Cf. State ex rel. Olson v. Litscher*, 2000 WI App 61, ¶ 3, 233 Wis. 2d 685, 608 N.W.2d 425 (an issue is moot when our resolution thereof would be purely academic and have no practical effect on the ultimate controversy; we need not address such issues).

¶ 50. We do address Great Lakes' claim that because the defendants prevailed on the merits, the circuit court should have awarded them their costs. Great Lakes contends that costs were mandatory, pursuant to Wis. Stat. § 814.03(1). English Manor, on the other hand, urges us to apply a different statute, namely Wis. Stat. § 806.04 (entitled "Uniform declara-

791

tory judgments act"). Section 10 of that statute gives a court discretion to award costs "as may seem equitable and just." Which statute applies to a set of facts presents a legal question for our independent review. *Brown County DHS v. Terrance M.*, 2005 WI App 57, ¶ 12, 280 Wis. 2d 396, 694 N.W.2d 458, *review denied*, 2005 WI 134, 282 Wis. 2d 723, 700 N.W.2d 274 (Nos. 2004AP2379 and 2004AP2380).

¶ 51. In *Ballenger v. Door County*, 131 Wis. 2d 422, 433, 388 N.W.2d 624 (Ct. App. 1986), we observed that when two statutes deal with the same subject matter, the more specific statute controls. We concluded that WIS. STAT. § 806.04 governed that case because it relates specifically to declaratory judgments. *Ballenger*, 131 Wis. 2d at 433. Great Lakes points out that *Ballenger* involved only an action for declaratory relief, whereas here, English Manor also requested injunctive relief. Thus, Great Lakes argues, this case is not a "pure" declaratory judgment case. According to Great Lakes, if we apply § 806.04 to a "mixed case" like this one, we would render WIS. STAT. § 814.03(1) a nullity in most civil actions because plaintiffs could avoid its mandatory costs rule by simply tacking on a claim for declaratory relief.

¶ 52. We disagree with Great Lakes' analysis because the request for declaratory judgment in this case was not a mere afterthought tacked onto other relief. Rather, it was the driving force in this litigation. English Manor could not have obtained an injunction without a declaration that the City's expenditures violated the law. Moreover, the parties did not brief or argue the injunctive request, nor did the circuit court's judgment address it. The focus throughout was on the propriety of the City's various uses of room tax dollars. Thus, although English Manor asked for an injunction, the request

played a de minimis role in this action. Because we deem the prayer for injunctive relief purely incidental to the declaratory judgment, we hold that WIS. STAT. § 806.04(10) supercedes. *Cf. Town of Blooming Grove v. City of Madison*, 275 Wis. 328, 336, 81 N.W.2d 713 (1957) (injunction a proper means of effectuating a declaratory judgment).

¶ 53. Great Lakes argues in the alternative that even if we apply WIS. STAT. § 806.04, the circuit court erroneously exercised its discretion because it failed to give any rationale for its refusal to award costs. We will uphold the court's decision, however, when we can discern a reasonable basis for it in the record. *See State v. Pharr*, 115 Wis. 2d 334, 343, 340 N.W.2d 498 (1983). Here, the court did have a rational reason for saddling the parties with their own costs. When a statute has not been the focus of past decisions, the parties may spend, as has been the case here, considerable time and effort to inform and educate the court about the proper interpretation and application of the statute. Lawyers are officers of the court, and when they perform this office to the best of their ability, the court receives great assistance in reaching its decision, even if the ultimate decision favors one party. Given that the court benefits from both parties' analyses, we deem it proper when the court recognizes the efforts of each side by denying the prevailing party's motion for costs. It is evident that this was the rationale underlying the circuit court's decision in this case.

## CONCLUSION

¶ 54. We affirm the circuit court's judgment in its entirety. All of the City's uses of room tax dollars comported with the requirements of WIS. STAT. § 66.0615

because all of them qualified as means of promoting and developing tourism to Sheboygan. Regarding expenditures related to the Blue Harbor development, the conference center at Blue Harbor has hosted numerous meetings for educational, recreational, or business purposes, and many of the conference attendees have been from out of town and other states. Weissgerber's provides the food service for the conference groups and is an integral part of the convention center project. These appropriations do not violate English Manor's equal protection rights. Any benefits the resort business reaps from these conferences are due to its proximity to the convention center, given that all of the room tax dollars allocated for the Blue Harbor development subsidize only the separate convention center business.

¶ 55. With respect to the other expenditures, it is uncontested that the City's band concerts, holiday celebrations, and Taste of Sheboygan draw out-of-town visitors. The statute contains no requirement that these guests remain in Sheboygan overnight at a lodging facility. Moreover, English Manor admits that it would be proper for the local chamber of commerce or CVB to promote these activities. English Manor also concedes that the souvenirs the mayor provides to visitors would qualify as legitimate promotional items if the chamber of commerce or CVB paid for them. We see no reason why the City cannot do the same.

¶ 56. Finally, we conclude that the court properly required each party to bear its own costs. The award of costs was discretionary, given the incidental and inchoate nature of the prayer for injunctive relief, and there was no erroneous exercise of discretion.

*By the Court.*—Judgment affirmed.